IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| CAL-TENN FINANCIAL, LLC, ) <br> CAL-TENN GEORGIA, INC., ) <br> ) <br> **Plaintiffs,** ) <br> ) <br> vs. ) <br> ) <br> DEALER SERVICES FINANCIAL ) <br> CENTER, INC., ) <br> ) <br> **Defendant.** ) | Case No: <br><br> Judge: <br><br> JURY DEMAND |

## COMPLAINT

Come now the Plaintiffs Cal-Tenn Financial, LLC and Cal-Tenn Georgia, Inc., by and through counsel and for cause of action will respectfully show to the court as follows:

### I. PARTIES

1. Plaintiffs, Cal-Tenn Financial, LLC and Cal-Tenn Georgia, Inc. (collectively "Cal-Tenn") are Tennessee corporations and submit themselves to jurisdiction and venue of this court for the purposes of prosecuting this action. Cal-Tenn has offices and conducts its business at 3839 Dickerson Pike, Nashville, Davidson County, Tennessee.

2. Defendant, Dealer Services Financial Services, Inc. (Dealer Services), is a for-profit corporation, licensed in the State of Florida, whose principal place of business is 2166 S Orange Blossom Trail #120, Apopka, Orange County, Florida, and was acting by and through its agents, servants or employees who were, in turn, acting within the course and scope of their employment, and submits itself to the jurisdiction of this court by virtue of its operation in Apopka, Florida.

## II. JURISDICTION AND VENUE

3. This court has subject-matter jurisdiction of this action and by virtue of Title 28 U.S.C. Section 1332(a). There is complete diversity of citizenship between the parties, and the amount in controversy, exclusive of interests and costs, exceeds the sum of $75,000.00. Defendant has committed tortious injury in the state of Tennessee by means of acts or omissions committed in the state of Florida.

4. This Court has pendent jurisdiction over Plaintiffs' claims asserted under the Florida Unfair and Deceptive Acts and Practices Act (FDUTPA), F.S. 501.204 et seq., Florida's codification of UCC laws pertaining to Secured Transactions, F.S. 679.609-612, Florida's Theft by Conversion statute, F.S. 812.014, and Plaintiffs' claims asserted under the doctrines of common law fraud pursuant and common law conversion to Title 28 USC § 1367.

5. This Court is the proper venue in which to adjudicate this action under and by virtue of Title 28 U.S.C. Section 1391(a). The actions giving rise to Plaintiffs' claims were undertaken and initiated within this District and Division. Communications and disclosures relative to actions taken by Defendant involved this District and Division.

## III. FACTUAL BACKGROUND

6. Defendant Dealer Services is an automobile seller with multiple locations in Florida, with its primary location situated in Apopka, FL.

7. Dealer Services purchases, sells and finances used automobiles at its various locations.

8. Plaintiff Cal-Tenn is a third party service provider company that primarily services loans on automobiles. Cal-Tenn also purchases bulk loan packages from auto dealers, thereby taking ownership of and collection responsibilities for loans purchased in such packages.

9.      Both Plaintiffs and Defendant have been in their respective businesses for many years, and are fully aware of the normal course of business dealing in all matters pertinent to this complaint.

## Master Purchase Agreement

10.     Cal-Tenn entered into a Dealer Master Purchase Agreement (the " MP Agreement") (Exhibit A) with Dealer Services on April 9, 2014.

11.     Under the terms of the MP Agreement, Cal-Tenn purchased Dealer Services' interests in certain Conveyed Property and assets related to the Conveyed Property.

12.     At the time of any such sale, Dealer Services was obligated to provide to Cal-Tenn a listing of Conveyed Property purchased, a Bill of Sale and Assignment (included in "Exhibit A" to the Agreement), a Limited Power of Attorney (included in "Exhibit D" to the Agreement, and any necessary and proper documents to assign to Cal-Tenn Dealer Services' interest in properly securing the Conveyed Property.

13.     Paragraph 4(a)(i) of the Agreement specifically represents that Dealer Services was the sole owner of the receivables, free and clear of any liens or other claims.

14.     Paragraph 4(a)(ix) of the Agreement represents that all receivables comply with all applicable state and federal laws, including but not limited to the Federal Consumer Protection Act ("Truth in Lending") and Regulation Z, and the Federal Equal Credit Opportunity Act and Regulation B.

15.     Paragraph 4(b) of the agreement states that "If any of the foregoing warranties and representations are breached, Dealer Services shall, upon demand, immediately repurchase from Cal-Tenn and receivable with respect to which a warranty or representation was breached. The

repurchase price of receivable is 100% of the unpaid balance owing on the receivable contract at the time of the repurchase."

16. Paragraph 5(a) of the Agreement states that Dealer Services represented and warrantied its authority to enter into the Agreement, "which representations and warranties shall be reaffirmed with each purchase of the receivables."

17. Paragraph 12 of the Agreement states as follows: "CONFIDENTIALITY AND NON-SOLITICATION: Seller (Dealer Services) agrees that neither Seller nor any of its directors, officers, affiliates, employees, agents or representatives may disclose, directly or indirectly, any information concerning the Receivables, other than information that was previously available to the public, or as required by law or regulation. Further, Seller, its directors, officers, affiliates and employees may not solicit any such obligor for the purpose of making a loan or financing a retail sale or lend any money to or finance any sale to said obligors for a period of twenty-four (24) months from the execution of this Agreement."

18. Dealer Services, with regularity, sold vehicles to the same owner who purchased a vehicle within twenty-four months of the first sale.

**Bulk-Sale ("Freedom") Contracts**

19. In April 2014, Cal-Tenn entered into a Purchase Sell Agreement ("Freedom 1," attached as Exhibit B) under which they purchased 203 loans from Dealer Services, which loans had a face value of $1.89 million dollars. Cal-Tenn paid 82%, or $1.6 million dollars.

20. In August 2014, Cal-Tenn entered into a Purchase Sell Agreement ("Freedom 2," attached as Exhibit C) under which they purchased 227 loans from Dealer Services, which loans had a face value of $2.3 million dollars. Cal-Tenn paid 74%, or $1,7 million dollars.

21.     Under the terms of the Freedom Agreements, Cal-Tenn purchased Dealer Services' interests in certain Conveyed Property and assets related to the Conveyed Property.

22.     At the time of any such sale, Dealer Services was obligated to provide to Cal-Tenn a listing of Conveyed Property purchased, a Bill of Sale and Assignment (included in "Exhibit A" to the Freedom Agreements), a Limited Power of Attorney (included in "Exhibit D" to the Freedom Agreements, and any necessary and proper documents to assign to Cal-Tenn Dealer Services' interest in properly securing the Conveyed Property.

23.     Paragraph 5.02 (c) of the Freedom Agreements specifically represents that Dealer Services was the sole owner of the Conveyed Property, free and clear of any senior encumbrance, loans or other claims.

24.     Paragraph 5.01 (d) of the Freedom Agreements represents that all Conveyed Property comply with all applicable state and federal laws, which includes but is not limited to the Federal Consumer Protection Act ("Truth in Lending") and Regulation Z, and the Federal Equal Credit Opportunity Act and Regulation B.

25.     Paragraph 5.03 of the agreement states that "If any of the foregoing warranties and representations are breached, Dealer Services shall, upon demand, immediately repurchase from Cal-Tenn and receivable with respect to which a warranty or representation was breached. The repurchase price of the receivable is 100% of the unpaid principle of the balance owing on the receivable contract at the time of the repurchase."

**Actions Of Dealer Services**

26.     Upon purchase of *any* loan from Dealer Services by Cal-Tenn, under any of the three contracts, Cal-Tenn was given a power of attorney for *all* rights in the collateral. The title of the

vehicle(s) would be sent to Cal-Tenn, but Dealer Services remained listed as lien holder on the face of the title, as is common business practice.

27. If a vehicle were repossessed for non-payment on the loan, the vehicle would be returned to Dealer Services, whereby Dealer Services would make a "bid" on the vehicle, offering to buy the vehicle and title back from Cal-Tenn at an agreed-upon price. Cal-Tenn would either accept or reject the bid.

28. If Cal-Tenn agreed to the bid, Dealer Services was required to send a check for the agreed upon bid. Upon receipt of the check, Cal-Tenn would send the original title to Dealer Services completing the acceptance. If Cal-Tenn accepted a bid which was less than the balance of the loan on that vehicle, they would charge off any remaining balance on the loan.

29. Good faith and fair dealing, and common business practice in automobile sales and financing, requires that Dealer Services makes a fair and accurate assessment of the condition of the vehicle and submit a bid for the vehicle's true worth. As Dealer Services is located in Florida and Cal-Tenn in Tennessee, Cal-Tenn relied on Dealer Services to offer a fair value for vehicles as Cal-Tenn was not in a position to self-assess.

30. Dealer Services was expected to tender payment on the accepted bid within five (5) days of the agreed-upon transaction. Dealer Services rarely tendered payment in under thirty (30) days.

31. Dealer Services began a regular practice of defrauding Cal-Tenn by significantly misrepresenting the condition of repossessed vehicles and making a bid that was far below the true value of the vehicle.

32. Dealer Services would then sell the vehicle to a customer for significantly more than the price it had bid and agreed to pay Cal-Tenn for that same vehicle.

33.     Furthermore, Dealer Services began a regular practice of repossessing vehicles without the knowledge of Cal-Tenn, and would resell the repossessed vehicle to another customer, financing the loan through another loan servicing company to conceal the *entire* transaction from Cal-Tenn.

34.     Dealer Services, not in possession of the vehicle's title, would fraudulently request a duplicate copy of the title through the Florida Department of Highway Safety and Motor Vehicles ("FL DVM") to use in the unauthorized sale. This was done without the knowledge or consent of Cal-Tenn, and was a direct attempt to conceal the funding of the new contract.

35.     Because Cal-Tenn possessed the original title, and would have promptly sent the title to Dealer Services when paid by Dealer Services for an agreed-upon price, Dealer Services' acquisition of a duplicate title to conceal the transaction from Cal-Tenn was a fraudulent act. Dealer Services obtained over 200 duplicate titles for vehicles financed by Cal-Tenn.

36.     Florida's department of motor vehicles requires a reason for a request for a duplicate title, and any representation that the original title had been lost, stolen or damaged (the only three reasons permitted) was blatant fraud when selected by Dealer Services. A copy of the FL DMV Form HSMV 82101, used for the purpose of obtaining a duplicate title, is attached hereto as Exhibit D.

37.     Under Florida law, specifically F.S. 679.609-612, the party in possession of the title to a repossessed vehicle has the obligation to send a Notice of Our Intent to Sell Property to the debtor, giving them ten (10) days to redeem the vehicle before it is resold or otherwise disposed of. This letter is commonly known as the "10-day letter."

38. Dealer Services regularly resold repossessed vehicles within the 10-day window, while failing to notify Cal-Tenn of the repossession, which meant that Cal-Tenn had no knowledge that a 10-day letter was even required.

39. Cal-Tenn would frequently learn that Dealer Services had repossessed a vehicle to which Cal-Tenn had title when Cal-Tenn attempted to collect on the loan or repossess the vehicle from the customer they had on record as owning the vehicle.

40. Even after the fraudulent resale had occurred, Dealer Services failed to pay Cal-Tenn as required.

41. Cal-Tenn used its own resources to learn that the vehicles had been repossessed and resold to other owners, without Cal-Tenn's knowledge.

42. In some instances, vehicles associated with the loans purchased by Cal-Tenn would be wrecked beyond repair. As listed lienholder, Dealer Services would be paid by the vehicle owner's insurance company, deposit the funds, and fail to notify Cal-Tenn that the vehicle had been wrecked or that an insurance payment had been made. Dealer Services deliberately failed to pay Cal-Tenn the proceeds from the insurance claim.

43. On June 19, 2015, Cal-Tenn prepared a list of thirty five (35) vehicles on which they were owed payment. The amount owed was approximately $520,000.00.

44. Cal-Tenn sent representatives to Dealer Services to take possession of the 35 vehicles but not one of the cars was present on the lot. Mr. Burgett admitted that he had already sold the vehicles without Cal-Tenn's knowledge.

### Jarvis Mansfield

45. Cal-Tenn, in April 2015, sent its own employee, Jarvis Mansfield, to work at Dealer Services as an Asset Manager in an attempt to discover whether fraudulent practices were occurring and to ensure that all transactions were being carried out using best business practices.

46. Cal-Tenn paid Mr. Mansfield a salary, paid for the rent on his Florida apartment, and paid for all of the furnishings in that apartment. In all, Cal-Tenn paid more than $20,000.00 to Mr. Mansfield for his vehicle, salary, rent, expenses and sundries.

47. John Burgett, owner of Dealer Services, began manipulating Mr. Mansfield very soon after his arrival. He opened mail directly addressed to Mr. Mansfield, insisted on listening in on all phone calls between Cal-Tenn and Mr. Mansfield, and otherwise interfered with Mr. Mansfield's express purpose for being on-site at Dealer Services to look out for the best interests of Cal-Tenn.

48. Mr. Mansfield began cooperating with Mr. Burgett in his efforts to defraud Cal-Tenn, moved out of the apartment paid for by Cal-Tenn and unlawfully took all of the furniture purchased by Cal-Tenn with him, and began working directly for Dealer Services as a salesman. Cal-Tenn was forced to file a criminal complaint against Mr. Mansfield for the theft.

### Third Party Dealers

49. Dealer Services fraudulently contracted with third-party dealers by allowing them to remotely log into Dealer Services' software to structure deals without the necessary supplemental license (FL HSMV 84200; Off-Premises Sales). The third-party dealers were able to print the contracts at their remote locations, however the contracts and titles had Dealer Services listed as lienholder.

50. Dealer Services would then present these off-site sales to Cal-Tenn and Pinnacle Bank for funding. After funding, Dealer Services would send the funds to the third-party dealers minus a percentage and/or fee.

51. On *several* occasions, in creating these bogus contracts for vehicles sold by a third-party and attributed to Dealer Services, the customer would sign a purchase contract with the third-party dealer, and then Dealer Services would *forge the signature of the customer* on the Dealer Services version of the contract. An example of such forged contracts are attached hereto as Exhibit E.

### All Sales Transactions Are Null And Void

52. Based on information and belief, Dealer Services was being financed through a "floor plan" line of credit by Ray Tatum of Royal Investments, LLC.

53. By virtue of its own security interests in the inventory of Dealer Services, Ray Tatum through Royal Investments had an encumbrance on the vehicles owned by Dealer Services.

54. Due to this encumbrance, Dealer Services was not permitted to represent that the vehicles were unencumbered, and therefore every sale made by Dealer Services was null and void.

### Damages

55. In addition to the substantial actual damages incurred by Cal-Tenn in losses due to the direct and willful actions of Dealer Services, Cal-Tenn has also incurred enormous costs in man-hours to discover the unlawful activities of Dealer Services and has lost millions of dollars in business as a direct result.

## COUNT ONE - FRAUD

56.     The allegations contained in paragraphs 1 through 55 of Plaintiff's Complaint are incorporated herein by reference as if each of said paragraphs was restated and re-alleged in its entirety.

   a. **Fraud by Failing to Report Repossessions to Cal-Tenn**

      i. By repossessing vehicles and intentionally and knowingly failing to inform Cal-Tenn of the repossession, Dealer Services defrauded Cal-Tenn of the value of the loan balance, or portion thereof, based on the value of the repossessed vehicle.

      ii. By reselling a repossessed car, without notifying Cal-Tenn of the repossession, Dealer Services defrauded the purchaser of the repossessed vehicle by representing to the customer that the title to the vehicle was unencumbered, while the rightful title to the vehicle was held by Cal-Tenn.

      iii. By knowingly and intentionally representing to the state of Florida that the title had been lost or stolen in an effort to obtain a duplicate title, Dealer Services defrauded Cal-Tenn and the state of Florida. In doing so, Dealer Services violated Florida's Theft by Conversion law, F.S. 812.014, by knowingly using the property of another with intent to, temporarily or permanently, deprive the other person of a right to the property or a benefit from the property.

   b. **Fraudulent Concealment of Third-party Dealers**

      i. Dealer Services' rewriting third-party dealer sales contracts on Dealer Services paper – and in some cases forging customer signatures thereon – shows that

Dealer Services was attempting to conceal from Cal-Tenn the fact that these contracts had originated with a third-party dealer.

ii. Such misrepresentation, which took place on numerous occasions, constitutes and unequivocal breach of the representations and warranties set forth in Section 5(a) of the Dealer Master Purchase Agreement.

c. **Fraud by Misrepresentation of Vehicles' Value**

i. By intentionally and knowingly undervaluing vehicles repossessed and returned to Dealer Services' lot, Dealer Services defrauded Cal-Tenn of the actual value of the collateral and in doing so caused Cal-Tenn to charge off more than necessary on the unpaid loan balance.

## COUNT TWO – BREACH OF CONTRACT

57. The allegations contained in paragraphs 1 through 56 of Plaintiff's Complaint are incorporated herein by reference as if each of said paragraphs was restated and re-alleged in its entirety.

58. Dealer Services sale of vehicles to prior customers within 24 months was a direct breach of Section 12 of the Dealer Master Purchase Agreement.

59. Dealer Services' rewriting third-party dealer sales contracts on Dealer Services paper – and in some cases forging customer signatures thereon – shows that Dealer Services was attempting to conceal from Cal-Tenn the fact that these contracts had originated with a third-party dealer. Such misrepresentation, which took place on numerous occasions, constitutes and unequivocal breach of the representations and warranties set forth in Section 5(a) of the Dealer Master Purchase Agreement.

60. Dealer Services' representation that it was the sole owner of the receivables, free and clear of any liens or other claims, was a direct breach of Section 4(a)(i) of the Dealer Master Purchase Agreement.

61. By violating FDUTPA, F.S. 501.204, Dealer Services was in direct breach of Section 4(a)(ix) of the Dealer Master Purchase Agreement.

## COUNT THREE – THEFT BY CONVERSION

62. The allegations contained in paragraphs 1 through 61 of Plaintiff s Complaint are incorporated herein by reference as if each of said paragraphs was restated and re-alleged in its entirety.

63. Dealer Services violated Florida's Theft by Conversion law, F.S. 812.014, by knowingly using the property of another with intent to, temporarily or permanently, deprive the other person of a right to the property or a benefit from the property.

## COUNT FOUR – PUNITIVE DAMAGES AGAINST DEALER SERVICES

64. The allegations contained in paragraphs 1 through 63 of Plaintiff s Complaint are incorporated herein by reference as if each of said paragraphs was restated and re-alleged in its entirety.

65. In committing the wrongful acts described above, Dealer Services has acted in bad faith and has engaged in willful misconduct, malice, and a want of care giving rise to an inference of conscious indifference to the consequences of its actions.

66. Dealer Services has caused harm to Cal-Tenn in an amount to be determined by the enlightened conscience of a jury.

## COUNT FIVE – ATTORNEYS FEES AND EXPENSES AGAINST DEALER SERVICES

67. The allegations contained in paragraphs 1 through 66 of Plaintiff s Complaint are incorporated herein by reference as if each of said paragraphs was restated and re-alleged in its entirety.

68. In committing the wrongful acts described above, Dealer Services has acted in bad faith, been stubbornly litigious, and caused Cal-Tenn unnecessary trouble and expense.

69. Cal-Tenn is entitled to its attorneys' fees and expenses in having to bring this action.

## PRAYER FOR RELIEF

WHEREFORE, Cal-Tenn demands a jury trial on all issues so triable and prays that this Court award it the following relief:

a) That the Court enter judgment in favor of Cal-Tenn and against Dealer Services for compensatory damages, including prejudgment interest, in an amount to be determined by the trier of fact;

b) That the Court enter judgment in favor of Cal-Tenn for attorneys' fees and expenses of investigation and litigation based upon Dealer Services's bad faith, stubborn litigiousness, and causing Cal-Tenn unnecessary trouble and expense;

c) That the Court enter judgment in favor of Cal-Tenn for treble the amount of actual damages to be determined by the trier of fact;

d) That the Court enter judgment in favor of Cal-Tenn for punitive damages in an amount to be determined by the trier of fact;

f) That this Court enter such other and further relief as is just and proper.

This 17th day of June, 2016.

                                 */s/ Nanette J. Gould*
                                 **NANETTE J. GOULD, BPR. No. 26330**
                                 1550 W. McEwen Dr., Suite 300
                                 Franklin, TN 37067
                                 615-301-8577
                                 ngould@attorneyngould.com
                                 *Attorney for Plaintiffs*